UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

BOGDAN OSTROWSKI

                Plaintiff;

      v.

THE PORT AUTHORITY OF NY
& NJ,

              Defendant.

1:21-cv-3328 (NRM) (LB)

**Memorandum & Order**

NINA R. MORRISON, United States District Judge:

Pending before the Court is a motion by The Port Authority of New York and New Jersey to dismiss *pro se* Plaintiff Bogdan Ostrowski's employment discrimination action for failure to state a claim, which Defendant has moved the Court to convert to a motion for summary judgment pursuant to Rule 12(d) of the Federal Rules of Civil Procedure. Plaintiff (who filed voluminous exhibits in support of his opposition to the motion) does not oppose Defendant's request to convert the motion into one seeking summary judgment, but opposes dismissal on any and all claims. The Court has considered the parties' written submissions; statements that the parties made at oral argument held on January 26, 2023; and over 1,400 pages of written exhibits and additional audio and video exhibits submitted by Plaintiff in support of his claims. For the reasons outlined herein, Defendant's motion, construed as a motion for summary judgment, is GRANTED, and this action is DISMISSED.

1

**Background**

On May 7, 2007, The Port Authority of New York and New Jersey ("Defendant" or "The Port Authority") hired Plaintiff Bogdan Ostrowski ("Plaintiff") as an Electronic System Specialist ("ESS").[1]  ECF No. 38-12 at 2; ECF No. 38-2 at 1.[2] On June 25, 2020, after a series of disputes between Plaintiff and his supervisors, Defendant indefinitely suspended Plaintiff without pay.  ECF No. 1-5 at 87, 90.  This was Plaintiff's sixth suspension since July 2019.  ECF No. 1-5 at 87.

I.      Procedural Background

Plaintiff, believing these disciplinary actions to be unlawful, contacted the Equal Employment Opportunity Committee ("EEOC") and filed an "initial inquiry" through the EEOC's online portal on December 14, 2020.  ECF No. 21 at 12.  After speaking with an EEOC representative on March 9, 2021, ECF No. 21 at 14, Plaintiff filed a Charge of Discrimination on March 16, 2021, alleging age discrimination and retaliation.  ECF No. 21 at 9.  The EEOC issued Plaintiff a Dismissal and Notice of Rights on March 31, 2021, in which it informed Plaintiff that if he wished to proceed with his claim in a court, he must so file with 90 days.  ECF No. 21 at 8.

On June 14, 2021, Plaintiff filed this *pro se* action under the Age Discrimination in Employment Act ("ADEA") against Defendant.  *See* ECF No. 1.  In

---

[1]  Plaintiff's position is also at points referred to as an "Electronics System Specialist."  *See, e.g.*, ECF Nos. 1-5 at 106; 1-8 at 85.

[2]  Prior to this date, Plaintiff worked for the New York City Transit Authority, against which Plaintiff filed a separate employment discrimination action in this Court in 2007.  *See Ostrowski v. New York City Transit Authority*, 07-cv-2178 (E.D.N.Y.).  Judge Roslynn Mauskopf dismissed Plaintiff's action on August 20, 2009.

his complaint, Plaintiff alleged that Defendant subjected him to "harassment, negligence, [and] malpractice" due to his age.  ECF No. 1 at 4.  Plaintiff served Defendant on the same day, ECF No. 5, and Defendant entered an appearance through counsel on June 23, 2023.  ECF No. 7.  After requesting and receiving an extension to file its answer in light of the many exhibits that Plaintiff attached to his complaint, ECF Nos. 8; 9, Defendant filed a letter motion for a pre-motion conference on September 2, 2021, in anticipation of its motion to dismiss Plaintiff's action for failure to state a claim.  ECF No. 16.  In its letter motion, Defendant argued that Plaintiff's action was time-barred because Plaintiff failed to file a Charge of Discrimination with the EEOC within 180 days of the last allegedly discriminatory action (which took place on June 25, 2020), and that in any event Plaintiff's complaint does not state a claim under the ADEA.  ECF No. 16.  On October 27, 2021, Magistrate Judge Lois Bloom held a telephone conference and directed Plaintiff to file an amended complaint to address the potential deficiencies that Defendant noted in its pre-motion conference letter.  ECF No. 20.

Plaintiff filed his amended complaint on December 2, 2021, ECF No. 21, to which he attached a copy of the initial inquiry form that he submitted with the EEOC on December 14, 2020, as well as the Charge of Discrimination that he filed on March 16, 2021.  In the complaint, Plaintiff further alleges that Defendant "subjected Plaintiff to unprecedented [] egregious and unlawful predatory and retaliatory employment practices" which constitute "a clear trend and pattern of age, national origin, harassment, retaliation, hostile work environment and multifactor []

3

discrimination." ECF No. 21 at 24 ¶¶ 2–3. For example, Plaintiff alleges that he was denied overtime opportunities by his "dishonest supervisor," whereas newer employees were eligible for overtime "from day one of their employment" as a "favor" for their "loyalties" to Plaintiff's supervisors. ECF No. 21 at 26 ¶ 12. Plaintiff also alleges that, three-to-five years before his June 25, 2020 suspension, "three senior, experienced coworkers" named Timothy McCormmack, Jerome Oats, and Michael Pardo were "forced out" by certain newly-promoted supervisors, and that his supervisors preferred younger employees because it was "much easier to supervise [] new employees with less knowledge and experience." ECF No. 21 at 27–28 ¶ 17.[3] He also alleges that a system of "favoritism" among the supervisors led to higher pay among newer employees, which was "contrary to [the employees'] Union Agreement." ECF No. 21 at 29 ¶ 20. Plaintiff further alleges that he was overlooked for various promotions which instead went to workers who were "totally unqualified," ECF No. 21 at 47 ¶ 77, that his supervisors harassed him for wearing a tie to work, ECF No. 21 at 30 ¶¶ 25–26, 49, and that he was at one point required to clean garbage even though this responsibility did not fall to him as an Electronic System Specialist, ECF No. 21 at 32 ¶ 32. Plaintiff faced a series of suspensions and disciplinary actions dating from July 2019, which Plaintiff alleges were "fabricated" and "ridiculous." ECF No. 21 at 35–36 ¶ 36.

---

[3] Plaintiff also attached to his original complaint an exhibit, which is apparently a digital journal that Plaintiff kept in order to document his daily work activities and his interactions with his supervisors, identifying these employees as "T. McCormmack, J. Oats and . . . M. Pardo," who apparently stopped working for Defendant some time before April 17, 2018. ECF No. 1-6 at 70-71.

4

In his amended complaint, Plaintiff added a claim under Title VII of the Civil Rights Act of 1964 ("Title VII") alleging national origin discrimination.  Plaintiff, who is of Polish descent and who served as lieutenant in the Polish Air Force for sixteen years, ECF No. 21 at 25 ¶ 9, alleges that his supervisors harassed and suspended him because of his Polish heritage, noting that he speaks "with an accent and believed because of that he was a very easy target for inexperienced supervisors."  ECF No. 21 at 26 ¶ 10.

On December 15, 2021, Defendant informed the Court that it still intended to file a motion to dismiss, but that the parties believed that settlement discussions could be fruitful in light of the fact that the parties were currently arbitrating a parallel employment dispute.  ECF No. 22.  Magistrate Judge Bloom, after meeting with the parties by telephone on January 6, 2022, directed the parties to mediation. ECF No. 25.  The parties soon informed the Court that attempts to mediate this action had failed because the Court-annexed mediation program could not accommodate Plaintiff's request for in-person settlement discussions during the COVID-19 pandemic, and Plaintiff did not agree to conduct the meditation virtually. ECF Nos. 26; 28.

Judge Kiyo Matsumoto, who at that time presided as the district court judge over this case, held a pre-motion conference on June 9, 2022 on Defendant's anticipated motion to dismiss Plaintiff's claim on the basis of untimeliness and failure to state a claim on the merits.  *See* ECF Nos. 29; 47.  During the pre-motion conference, which took place by telephone, *see* ECF No. 47 at 2:1, Plaintiff

5

represented to the Court that he filed his complaint with the EEOC on December 14, 2020. ECF No. 47 at 4:20–5:5. The Court informed Plaintiff that, "if that is the case," then Plaintiff's complaint would be timely, though only with respect to Plaintiff's June 25, 2020 suspension, and the Court later stated to Plaintiff that Defendant has "conceded" as much. ECF No. 47 at 5:18–23; 8:21–25. Defendant informed the Court that its position with respect to the timeliness of Plaintiff's December 14, 2020 submission to the EEOC was outlined in its pre-motion conference letter, in which Defendant wrote that "[s]olely for purposes" of considering the merits of Plaintiff's claim in the alternative, "the Port Authority assumes that [Plainitff's December 14, 2020 inquiry] constitutes a valid charge." ECF Nos. 47 at 5:20–6:1; 29 at 3 n.2. At the end of the conference, Judge Matsumoto set a briefing schedule for Defendant's motion to dismiss. ECF No. 47; ECF Text Order dated June 9, 2022. This action was then reassigned to this Court on October 18, 2022.

The parties filed their fully briefed motion on October 21, 2022. ECF No. 38. In its motion, as in its pre-motion conference letter, Defendant asserted that Plaintiff's claim fails both on the merits and for untimeliness because he did not file a Charge of Discrimination until March 21, 2021, which fell after the 180-day deadline applicable to Defendant's June 25, 2020 suspension. ECF No. 38-11. Plaintiff responded that he successfully states a claim of discrimination on the merits, and that his action is in fact timely because he filed his initial inquiry with the EEOC on December 19, 2020, which fell within his 180-day deadline. ECF No. 38-12. He also urged the Court to find that Judge Matsumoto's statements in the June 2022

telephone conference had resolved the timeliness issue in his favor and that Defendant had "admit[ted]" that Plaintiff's complaint was timely.  ECF No. 38-12 at 4.

The Court held an in-person oral argument on Defendant's motion on January 26, 2023.  At the conference, the Court directed Defendant to file supplemental briefing on the question of whether it waived its timeliness argument in light of Judge Matsumoto's statements at the June 9, 2022 pre-motion conference. Defendant so filed on March 3, 2023.  ECF No. 46.  On April 25, 2023, the Court, having reviewed the record but finding that it perhaps did not possess a true copy of the initial inquiry form that Plaintiff submitted to the EEOC on December 14, 2020, directed the parties to file with the Court "any documents that relate to [Plaintiff's] initial submission" with the EEOC.  *See* Text Order dated April 25, 2023.  On May 8, 2023, Defendant informed the Court that it possessed no such materials.  ECF No. 48.  On the same day, Plaintiff filed with the Court a different copy of his previously-submitted EEOC initial inquiry form, but no other documents.  ECF No. 49.  Since that date, the Court has taken Defendant's motion under advisement.

II.    Factual Background

As for the merits of the underlying dispute, although Plaintiff and Defendant disagree over whether Defendant's actions towards Plaintiff over the course of his employment constitute age or national origin discrimination, there appears to be no dispute that for over a decade prior to filing his EEOC charge, the parties' employment relationship was fraught with conflict.  A few of the key conflicts that

led to Plaintiff's suspension and the filing of the instant lawsuit are outlined here, with all facts either undisputed or presented in the light most favorable to Plaintiff.

For example, on January 8, 2009, Plaintiff's supervisor Michael Casalaspro (who Plaintiff alleges was 55 years old as of July 2020, ECF No. 1-5 at 50) described in an internal memorandum, on which Plaintiff was copied, an instance in which Plaintiff allegedly refused to wear a hardhat in a hard hat area; behaved "aggressive[ly] and loud[ly]" towards his supervisors and towards contractors; and had previously yelled at a Verizon contractor over the phone.  ECF No. 1-3 at 95–96. Casalaspro wrote that he felt that it was "important . . . to document these two incidents" since he has "had numerous discussions with [Plaintiff] . . . yet this behavior continues."  ECF No. 1-3 at 96.  Plaintiff responded to Casalaspro's memorandum three days later contesting Casalaspro's version of events and asserting that he behaved as he did because the security of Port Authority's facilities was at risk due to faulty work by contractors.  ECF No. 1-3 at 93–94.

Plaintiff has also had a continuing feud with his supervisor Michael Serpica. On October 17, 2016, for instance, Serpica emailed Plaintiff's other supervisors to memorialize an instance in which Plaintiff allegedly called Serpica a "liar" in front of other ESS technicians when Serpica told his staff that lunch was from 11:00 AM to 11:30 AM.  ECF No. 1-9 at 20.  On March 27, 2017, Serpica, who apparently wears a hearing aid, informed Plaintiff's other supervisors that Plaintiff allegedly refused to work with Serpica when ordering necessary parts, and allegedly made a disrespectful "remark about [Serpica's] hearing."  ECF No. 1-10 at 43.  Serpica also

8

memorialized another instance in an April 18, 2018 email in which Plaintiff allegedly called Serpica's instructions "bullshit" in front of the ESS staff.  ECF No. 1-9 at 23.

On April 1, 2019, Chief Maintenance Supervisor Steven Pszczola (who Plaintiff also alleges is of retirement age, ECF No. 1-5 at 50), memorialized a meeting he held with Plaintiff in which he summarized various similar allegations regarding Plaintiff's behavior towards Serpica, including Plaintiff refusing to follow standard procedures when ordering parts; "repeatedly and loudly" calling Serpica a "liar" when he attempted to address this issue with Plaintiff; and mocking Serpica for wearing a hearing aid.  ECF No. 1-3 at 125–26.[4]  The same memorandum also noted that Plaintiff's relationship with Casalaspro remained antagonistic.  ECF No. 1-3 at 126.  Pszczola warned Plaintiff that if his "disrespectful and unacceptable" behavior continued, Plaintiff would be subject to discipline. ECF No. 1-3 at 126. Contemporaneous emails among Plaintiff's supervisors reveal a consensus that Plaintiff was causing a "hostile work environment" but that some Port Authority staff were, at that time, hopeful that they could "talk to him before [they] ha[d] to write him up."  ECF No. 1-9 at 88–89.  On April 25, 2019, Plaintiff filed a response to Pszczola's memorandum, asserting that Pszczola's allegations were false, that he has never behaved disrespectfully towards his co-workers, that the memorandum was "disgraceful" and written "to damage my name," that his supervisors were

---

[4]  Pszczola wrote Plaintiff two similar memoranda on April 18, 2017 and April 18, 2018, informing Plaintiff that loudly calling his supervisor a "liar" and ordering parts outside of normal procedures was disrespectful and could subject him to discipline.  ECF Nos. 1-10 at 94; 1-11 at 56.

"incompetent," "low skilled, former electricians without any knowledge and experience" with "no morals" who showed favoritism to certain employees in the distribution of overtime opportunities, and that in fact it was the supervisors who behaved disrespectfully towards Plaintiff.  ECF No. 1-3 at 132–144.  Plaintiff also allegedly posted a copy of the memorandum on the wall of his workstation with the words "ongoing harassment & false statements" handwritten in marker in large letters over the first page.  ECF No. 1-12 at 62–63.

Plaintiff also attached to his complaint other internal Port Authority memoranda that documented further of history disciplinary action, including Plaintiff's six suspensions.  For instance, Casalaspro advised Plaintiff in a June 26, 2019 letter that, despite many warnings, he had come to work wearing a tie, which, for safety reasons, did not constitute proper Port Authority attire for ESS technicians who worked with mechanical devices that have moving parts.  ECF No. 1-3 at 145.  Plaintiff has repeatedly described his supervisors' comments on his failure to wear his standard work uniform to be "aggressive[]" attempts to "remove my tie," and that in fact Plaintiff's supervisors were "afraid of the power of my tie." *See, e.g.*, ECF No. 1-5 at 45.

On July 17, 2019, for the first time, Plaintiff was suspended without pay for three days for allegedly acting disrespectfully to a fellow ESS Technician at a Port Authority shooting range and for behaving insubordinately towards Serpica and Pszscola.  ECF Nos. 1-3 at 147, 152; 1-4 at 7–12.  After Plaintiff returned from his suspension, his access to the Port Authority systems was apparently not restored

for several weeks.  ECF No. 1-4 at 4–5, 16–17.  Plaintiff continued to tell Port
Authority staff that he felt that Casalaspro, Serbica, and Pszscola were subjecting
Plaintiff to harassment and bullying.  *See, e.g.*, ECF No. 1-4 at 26, 38.

Plaintiff also apparently had a difficult relationship with a manager named
Aaron Sherburne, who warned Plaintiff in an email on October 25, 2019 that
Plaintiff's continued refusal to participate in a mandatory work training program
would be considered an act of insubordination that could subject him to further
discipline.  ECF No. 1-4 at 50–51.  Plaintiff responded to Sherburne on October 28,
2019, with his other supervisors copied, asserting that Sherburne was being misled
by Plaintiff's other supervisors, that Plaintiff's supervisors were "bull[ies]," and that
Plaintiff's actions did not constitute insubordination.  ECF Nos. 1-4 at 46–50; 1-8 at
118.  Plaintiff also emailed Sherburn on October 29, 2019, with his other
supervisors copied, stating his belief that, in order to stop their antagonistic
behavior, Serpico and Casalaspro should be "[i]mmediately isolated" from the ESS
team and be required to payback 70% of the overtime they accrued in previous
years.  ECF No. 1-4 at 55–56.  Plaintiff was then again suspended without pay, this
time for seven days, on October 30, 2019 for repeatedly refusing to complete the
training that his supervisors directed him to complete. ECF No. 1-4 at 70–74.
Plaintiff's supervisors memorialized Plaintiff's alleged behavior in contemporaneous
emails to each other, which included allegations that Plaintiff repeatedly ignored
his supervisors' verbal requests that Plaintiff complete this training.  *See, e.g.*, ECF
Nos. 1-8 at 114; 1-9 at 6.  In the same emails, Plaintiff's supervisors expressed their

frustration that they "can't even . . . assign[] [Plaintiff] work" out of a fear that Plaintiff will turn around and accuse his supervisors of threatening him.  ECF No. 1-9 at 8.  Upon his return, Plaintiff again did not regain access to the Port Authority systems for several weeks.  ECF No. 1-4 at 75.

On February 10, 2020, Plaintiff was again suspended without pay, this time for fifteen days.  ECF Nos. 1-4 at 138; 1-5 at 36.  On February 7, 2020, Defendant alleged that when Casalaspro attempted to assist Plaintiff in logging into the Port Authority system, Plaintiff told Casalaspro "you wouldn't know" how to do that "because you do not know anything."  ECF No. 1-4 at 140.  In a response memorandum, Plaintiff acknowledged that he told Casalaspro "he doesn't know how this system works" but alleged that Casalaspro was "intentionally . . . trying to make [him] upset" over the course of that interaction.  ECF No. 1-4 at 143.  At the end of this suspension, Plaintiff again had difficulty re-accessing the Port Authority systems.  *See, e.g.*, ECF No. 1-4 at 152.

On March 4, 2020, Plaintiff emailed Serpica, Casalaspro, Sherburne, and Pszczola, informing that, as a "preventative measure" against their "aggressive and unacceptable behavior," Plaintiff would no longer verbally communicate with his supervisors at all, and would accept assignments only in writing.  ECF No. 1-5 at 24–25.  Plaintiff also apparently began frequently recording his supervisors and coworkers by audio and video.  *See, e.g.*, ECF No. 1-11 at 48.  On May 14, 2020, Plaintiff was suspended for a fourth time for allegedly refusing to come into his supervisor's office upon verbal request.  ECF No. 1-5 at 26–27; 53–54.  On this

12

occasion, Plaintiff was escorted out of his workplace by two police officers.  ECF No. 1-5 at 54.  In an email, Plaintiff explained that he did not comply with his supervisor's verbal request since he had previously informed his supervisors that he would now only accept such requests by email.  ECF No. 1-5 at 29–30.  Plaintiff also alleged that his May 2020 suspension was retaliatory, since the previous day he had informed his supervisor Igor Khreptyk that certain unsecured cables in the hallways of his workspace constituted a tripping hazard.  ECF No. 1-5 at 29–30, 37.  When Plaintiff informed Khreptyk of this issue, Khreptyk handed Plaintiff a roll of black tape to address the problem, which Plaintiff took as "punish[ment]" for his comment, since he was not responsible for placing the cables in the hallway in the first place.  ECF No. 1-5 at 29.  In the same letter, Plaintiff also accused his supervisors of corruption, writing that they "make additional money from fabricated overtime" and use "new employee[s]" who are "easy to manipulate" to further their scheme.  ECF No. 1-5 at 46–47.

On May 22, 2020, Plaintiff's supervisors ordered that he be medically evaluated by the Port Authority Office of Medical Services in light of Plaintiff's recent series of suspensions.  ECF No. 1-5 at 63.[5]  On May 28, 2020, a doctor from New York University Langone Health services—who, from the record, is not apparently associated with Port Authority's internal medical services—cleared Plaintiff to work.  ECF No. 1-5 at 66.  Plaintiff was advised through a work order on

---

[5]  Plaintiff's supervisors had ordered Plaintiff to undergo a similar medical evaluation on May 11, 2018 after Plaintiff accused Serpica of being a "manipulative" and "corrupted" supervisor who wanted to "bring [Plaintiff] down."  ECF No. 1-7 at 18.

June 1, 2020 that he nonetheless must attend a medical evaluation appointment with the Port Authority's Office of Medical Services on June 2, 2020.  ECF No. 1-5 at 67.

On June 2, 2020, Plaintiff was suspended without pay for a fifth time for refusing to participate in his scheduled medical evaluation, asserting to Pszczola that the appointment was simply part of his supervisors' ongoing harassment campaign.  ECF No. 1-5 at 69, 71.  On June 3, 2020, Plaintiff visited the Office of Medical Services, who found Plaintiff to be "fit for full duty."  ECF No. 1-5 at 72. Nonetheless, internal emails among Plaintiff's supervisors reveal that the supervisors felt that Plaintiff "has created a hostile work environment" that has caused all involved "an extreme amount of stress" and recommending that Plaintiff "be removed from the work place."  ECF No. 1-5 at 73.

On June 10, 2020, Pszczola warned Plaintiff in a written memorandum that he must comply with his supervisors' written and verbal orders without challenging them; must wear only his Port Authority-approved unform to work; and must appear in person when a supervisor calls Plaintiff into his office.  ECF No. 1-5 at 80. Pszczola further warned Plaintiff that further insubordination would lead to disciplinary action "up to and including termination."  ECF No. 1-5 at 81.  Plaintiff responded to the memorandum by email on June 11, 2020, alleging that Pszczola created the memorandum in "bad faith" and that Plaintiff's supervisors were a "low minded group of people" whose goal was to keep Plaintiff suspended.  ECF No. 1-5 at 82–83.

On June 25, 2020, Plaintiff was suspended for a sixth time, this time indefinitely.  ECF No. 1-5 at 87, 90.  By way of explanation, Defendant provided Plaintiff with a memorandum documenting fifteen instances in the preceding six weeks in which Plaintiff refused to follow his supervisors' orders; refused to appear in person in his supervisors' offices as verbally requested; and did not wear appropriate work attire.  ECF No. 1-5 at 92–94.  Plaintiff's supervisors also wrote contemporaneous emails to each other memorializing Plaintiff's alleged behavior in the preceding days, including Plaintiff's alleged response to Casalaspro's order to go into Casalaspro's office, "No!  I will never come into your office!"  *See, e.g.*, ECF No. 1-8 at 33.  Plaintiff and Defendant then commenced a lengthy arbitration process through Plaintiff's union.  During this time, Plaintiff wrote a letter on November 23, 2020 to Governors Andrew Cuomo and Phil Murphy informing them that his supervisors at the Port Authority were "malicious," "without skills," "corrupted," and "autocratic," and asking that he be reappointed to his position at the Port Authority through executive order.  ECF No. 1-5 at 107–111.

## Legal Standard and Analysis

A complaint must plead "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Matson v. Bd. of Educ. of City School Dist. Of N.Y.*, 631 F.3d 57, 63 (2d Cir. 2011) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  In reviewing a *pro se* complaint, the

15

court must be mindful that a plaintiff's pleadings should be held "to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam) (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)); *see Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (noting that even after *Twombly*, the court "remain[s] obligated to construe a pro se complaint liberally").

Under Rule 12(d) of the Federal Rules of Civil Procedure, however, the Court may elect to convert a defendant's motion to dismiss into a motion for summary judgment under Rule 56 by relying on materials outside the pleadings that the parties have submitted. Fed. R. Civ. P. 12(d). If the Court chooses to proceed in this way, then "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d). *See Krijn v. Pogue Simone Real Est. Co.*, 896 F.2d 687, 689 (2d Cir. 1990) (noting that the district court must give the non-moving party "a reasonable opportunity to meet facts outside the pleadings" (citation omitted)). In addition, Rule 12.1 of the Local Rules of the Eastern District of New York require a represented party to serve notice on a party proceeding *pro se* that it intends to move the Court to treat its motion to dismiss as a motion for summary judgment through reliance on matters outside the pleadings. *See* E.D.N.Y. Civ. R. 12.1. Even if these procedural requirements are met, however, "[w]hether to convert a motion to dismiss into a motion for summary judgment is left to the sound discretion of the district court." *Feliz v. City of New York*, 19-cv-6305, 2022 WL 446043, at *3 (S.D.N.Y. Feb. 14, 2022).

Should the district court convert a motion to dismiss into a motion for

summary judgment under Rule 12(d), the standard of review for summary judgment applies to the motion, rather than the standard for a motion to dismiss, and the court may grant the motion only if the record demonstrates "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Fernandez v. Windmill Distrib. Co.*, 159 F. Supp. 3d 351, 358 (S.D.N.Y. 2016) (quoting Fed. R. Civ. P. 56(a)). In its analysis, the Court must "view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of West Harford*, 361 F.3d 113, 122 (2d Cir. 2004).

A. **Application of Rule 12(d)**

In this action, the Court concludes that the procedural prerequisites for an application of 12(d) of the Federal Rules of Civil Procedure have been met, and it will exercise its discretion to convert Defendant's motion to dismiss into a motion for summary judgment. *Feliz*, 2022 WL 446043, at *3. Defendant provided Plaintiff with a Local Rule 12.1 statement when it submitted its motion to dismiss. ECF No. 38-1. At oral argument on January 26, 2023, the Court also gave the parties notice that it was inclined to convert Defendant's motion under Rule 12(d), O.A. Tr. 41:16–19, and since that time the parties have had ample opportunity to submit additional materials on which they wished the Court to rely. Plaintiff, for example, provided the Court with extensive audio and video materials that he did not include in his Amended Complaint. O.A. Tr. 22:8–27:6. Plaintiff also moved the Court on February 9, 2023 to consider in its summary judgment analysis the exhibits attached to

17

Plaintiff's original complaint even though, formally, that complaint was replaced in full upon submission of Plaintiff's Amended Complaint.  ECF No. 43.  The Court granted that motion.  *See* Text Order dated February 9, 2023.

The Court therefore applies the summary judgment standard to Plaintiff's ADEA and Title VII claims, rather than the standard applicable to these claims on a motion to dismiss.  As such, the Court may grant Defendant's motion only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

### B. <u>Timeliness</u>

An employee who seeks to bring a federal action for employment discrimination must first exhaust his administrative remedies by filing a Charge of Discrimination with the EEOC within the applicable limitations period.  *Dezaio v. Port Auth. of N.Y. and N.J.*, 205 F.3d 62, 63 (2d Cir. 2000).  Failure to so file typically deprives a court of subject matter jurisdiction over the employment discrimination action if raised as an affirmative defense by the adverse party.  *Love v. Pullman Co.*, 404 U.S. 522, 523 (1977).

The deadline by which to file a charge with the EEOC, however, varies both by state and sometimes—as is relevant here—by employer.  A plaintiff must file his charge with the EEOC "within 180 days after the alleged unlawful practice occurred or within 300 days where the alleged unlawful practice occurred in 'a State which has a law prohibiting discrimination in employment because of age and establishing or authorizing a State authority to grant or seek relief from such discriminatory

18

practice.'" *Dezaio*, 205 F.3d at 65 (citing 28 U.S.C. § 633(b)).  Because New York law indeed prohibits age discrimination in employment, *see* N.Y. Exec. Law. § 291(1), and because New York has established the New York Division of Human Rights to grant relief for such discrimination, an employee typically has 300 days from the date of the adverse employment action to file a charge against his New York employer.

The Port Authority of New York and New Jersey, however, is unique among New York employers for purposes of a court's timeliness inquiry under 28 U.S.C. § 633(b).  As a bi-state agency between New York and New Jersey, the Port Authority "lies outside New York's anti-discrimination regime." *Dezaio*, 205 F.3d at 65.  For that reason, "the 180-day limitation period" codified in 29 U.S.C. § 633(b), rather than the 300-day period, "applies in the case of an employee of the Port Authority." *Id.*  For a federal employment discrimination action to be timely, then, a Port Authority employee must file a Charge of Discrimination with the EEOC within 180 days of the alleged adverse employment action. *Id.*

While the application of this 180-day rule may seem straightforward, it is complicated here by the parties' dispute over when exactly Plaintiff "filed" his required charge with the EEOC.  Defendant argues that Plaintiff's action is clearly untimely because he did not file his formal Charge of Discrimination with the EEOC until more than 180 days after his most recent suspension.  Plaintiff's most recent suspension took effect on June 25, 2020.  He therefore had only 180 days after that date, until December 22, 2020, to file a Charge of Discrimination with the

EEOC against defendant Port Authority.  Plaintiff did not file his Charge until March 16, 2021, several months after the 180-day deadline had lapsed.  ECF No. 21 at 9–11.  Plaintiff argues, however, that he timely complied with the EEOC-exhaustion requirement because he filed an "initial inquiry" with the EEOC on December 14, 2022—roughly a week *before* Plaintiff's 180-day deadline expired. ECF No. 21 at 12.  The Court must therefore determine whether it can construe this December 14, 2022 document as a "charge" for purposes of its timeliness inquiry.

The Supreme Court held in *Federal Express Corp. v. Holowecki* that an initial intake form with the EEOC can constitute a "charge" if the submission is "reasonably construed as a request for the agency to take remedial action to protect the employee's rights or otherwise settle a dispute between the employer and the employee."  552 U.S. 389, 402 (2008).  The Second Circuit has since articulated a similar standard.  *See Littlejohn v. City of New York*, 795 F.3d 297, 305 n.2 (2d Cir. 2015) ("When the Intake Questionnaire manifests intent to have the agency initiate its investigatory processes, the questionnaire can itself constitute a charge of discrimination.").  The EEOC apparently modified its intake form (at least, the forms available for a claimant to fill out in person or to send in by mail) in response to *Holowecki*,[6] and the form now typically "requires a claimant to clearly express his or her intent by checking one of two boxes, thereby forcing claimants to decide whether their questionnaire is a request for the agency to take remedial action . . .

---

[6]  *See Miller v. St. Luke's Roosevelt Hosp. Ctr.*, 15-cv-7019, 2016 WL 1275066, at \*5 (S.D.N.Y. Apr. 1, 2016) ("The EEOC no longer uses the form described in *Holowecki*.").

or merely a request for further information." *Smith v. AECOM Tishman*, 21-cv-2915, 2023 WL 2734430, at \*6 (S.D.N.Y. Mar. 30, 2023) (cleaned up).  And since the change to the EEOC's form, "courts commonly hold that checking Box 2 on the current form of the EEOC's Intake Questionnaire, which authorizes the EEOC to look into the discrimination described in the form and describing that discrimination in detail in the Questionnaire . . . qualifies as a charge with the EEOC for timeliness purposes." *Miller v. St. Luke's Roosevelt Hosp. Ctr.*, 15-cv-7019, 2016 WL 1275066, at \*5 (S.D.N.Y. Apr. 1, 2016) (citation and quotation marks omitted)).

Although the record that Plaintiff submitted in support of his action is over 1,400 pages, the facsimile of the Initial Intake form that Plaintiff filed with this Court in support of his Amended Complaint, which Plaintiff apparently submitted to the EEOC on December 14, 2020, does not seem to be the same (revised) EEOC form described in *Smith* or *Miller*.  For example, the Initial Inquiry form that Plaintiff included as an attachment to his amended complaint apparently includes no option—such as a "box" that Plaintiff could check—for Plaintiff to convey to the EEOC that he wished that his intake be construed as a charge.  *See* ECF No. 21 at 12–23.  Moreover, the completed intake form that Plaintiff submitted to the Court was ostensibly completed on December 14, 2020, ECF No. 21 at 12, yet it also includes facts that post-dated Plaintiff's initial submission, such as a summary of Plaintiff's interview with an EEOC investigator on March 9, 2021, *see* ECF No. 21 at 14.  For that reason, this Court, concerned that the record was incomplete,

directed the parties on April 25, 2023 to confer and determine whether either party had a copy of Plaintiff's original completed Initial Intake form "or any documents that relate to that initial submission."  *See* Text Order dated April 25, 2023.  On May 8, 2023, Defendant informed the Court that it had no such documents.  ECF No. 48.  On the same day, Plaintiff submitted to the Court a copy of his Initial Intake form that was similar to the form to which the Court already had access, ECF No. 49-1, but which no longer included information that obviously post-dated December 14, 2020.  Plaintiff submitted no other additional documents.[7]

The question, then, is whether Plaintiff's Intake Form is a "charge" within the meaning of *Holowecki*.  The Court concludes that—even examining the completed form in the light most favorable to Plaintiff—it is not.  Although Plaintiff's intake form does not include the clarity of a single checked box telling the

---

[7] The Court remains concerned that the record may not include all documents that relate to his initial inquiry with the EEOC.  For example, it seems exceedingly likely to the Court that Plaintiff received a confirmation email from the EEOC upon submitting his initial intake form, but Plaintiff asserted at oral argument that no such email existed, O.A. Tr. 15:10–16, and provided the Court with no such material after the Court's April 25, 2023 order, even though the Court directed the parties to confer and provide the Court with "*any* documents that relate to [Plaintiff's] initial submission" with the EEOC.  *See* Text Order dated April 25, 2023 (emphasis added).  The Court's concern is heightened by the fact that Plaintiff, in response to the Court's April 25 order, emphasized that he believed that the Court was focusing too greatly on whether or not this action is timely, and that the Court's timeliness inquiry was only serving to obstruct his case.  ECF No. 49.  Given the ample opportunities Plaintiff has had to submit any and all documents related to the form for purposes of evaluating his timeliness claim, the Court will adjudicate this motion on the present record.

EEOC that he did *not* intend to file a charge at that time,[8] the record as a whole supports this conclusion.  First, Plaintiff, in his own Amended Complaint, informed the Court that, even from his perspective, he filed a "charge" with the EEOC on March 16, 2021.  ECF No. 21 at 6.  Second, the initial intake form submitted by Plaintiff repeatedly refers to Plaintiff as a "potential" charging party: for instance, the form asks for the "*potential* charging party's demographics" and the "location of [the] *potential* charging party's employment," ECF No. 49-1 at 2 (emphasis added), which supports the inference that the EEOC disclaimed to Plaintiff when he was filing his inquiry form that he was not filing a charge, and Plaintiff did not otherwise request the EEOC to construe his initial intake form as a charge or take immediate action.  The form further advises the Plaintiff of his "approximate deadline for filing a charge," ECF No. 49-1 at 1, which also supports the inference that Plaintiff was on notice that the intake form he completed was in fact not a charge.  In addition, when the intake form asked Plaintiff to provide the contact information for "anyone who will support [his] claim," Plaintiff responded that he "will do [that] later," ECF No. 49-1 at 4, further supporting the inference that Plaintiff was not requesting the EEOC to take remedial action, as it would have

---

[8]  It is possible that the forms described in *Smith* and *Miller*, which include boxes which a claimant can explicitly mark to request the EEOC to take remedial action, is available only in-person or when the claimant submits his inquiry by mail, and is different from the forms that a claimant fills out on the EEOC website.  For that reason, this form was perhaps unavailable to Plaintiff.  Plaintiff submitted his intake form in December 2020 at the height of the COVID-19 pandemic, during which time "the EEOC developed a procedure for handling discrimination charges" and "directed to file charges through [the] public portal."  *Coleman v. N.Y.C. Dep't of Health and Mental Hygiene*, 20-cv-10503, 2022 WL 704304, at *3 (S.D.N.Y. Mar. 9, 2022).

been very difficult for the EEOC investigate Plaintiff's claim without the ability to contact Plaintiff's supporting witnesses.  Indeed, Plaintiff scheduled an interview with an EEOC on March 9, 2021 to discuss the substance of his claim.  ECF No. 21 at 14.

These facts collectively establish that Plaintiff did not believe at the time he filed his intake form that he was filing a charge with the EEOC on December 14, 2020, nor can his initial intake form be reasonably construed as a request that the EEOC take remedial action at that time.  The Court therefore concludes that Plaintiff's initial intake form cannot be construed as a Charge of Discrimination sufficient to exhaust his administrative remedies within the required 180-day period in which to do so.  Because Plaintiff did not file a Charge of Discrimination until March 16, 2021—several months after the 180-day deadline following his June 25, 2020 suspension—his action is untimely.

### i.  **Equitable Tolling**

A court may equitably toll the EEOC charge filing deadline, but only in "rare and exceptional circumstances, in which a party is prevented in some extraordinary way from exercising his rights."  *Zerilli-Edelglass v. N.Y.C. Transit Auth.*, 333 F.3d 74, 80 (2d Cir. 2003) (citations, alterations, and quotation marks omitted).  Here, Plaintiff has not argued that any such exception circumstances warrant an application of equitable tolling in this case.  However, in light of its unique duty to *pro se* litigants, the Court considers the matter independently and concludes that

equitable tolling does not apply.

The Court notes, *sua sponte*, that the EEOC apparently miscalculated Plaintiff's filing deadline, incorrectly informing Plaintiff after he submitted his initial intake form that he had until approximately "April 22, 2021" to file a charge—that is, 300 days after Plaintiff's June 25, 2022 suspension—when in fact, in light of the Port Authority's unique status as a bi-state agency, his deadline to file a charge was December 20, 2020.  Under different facts, the Court might conclude that this incorrect information from the EEOC warrants equitable tolling. In this case, however, Plaintiff has never asserted, and the Court in its review of the record has no reason to independently conclude, that Plaintiff actually relied on the EEOC's automatically-generated deadline when proceeding with his action.  Seeing nothing else in the record that suggests that Plaintiff, even during the COVID-19 pandemic, was "prevented in some extraordinary way" from filing a timely charge with the EEOC, *Zerilli-Edelglass*, 333 F.3d at 80, the Court concludes that an application of equitable tolling would be inappropriate in this action.

### ii.   <u>Waiver</u>

Because the "[f]ailure to file a timely charge of discrimination acts as a non-jurisdictional bar to suit in federal court," this defense is subject to waiver if an adverse party fails to raise it with the court.  *Johnson v. Dynamic Educ. Systems, Inc.*, No. 08-CV-5233, 2011 WL 2635444, at *5 (E.D.N.Y. July 5, 2011).  Defendant has asserted in both its pre-motion conference letter before Judge Matsumoto and in its brief before this Court that Plaintiff's entire action is untimely, including with

respect to Plaintiff's June 25, 2020 suspension. However, at oral argument on January 26, 2023, the Court asked Defendant whether it had in fact waived this defense during a pre-motion conference before Judge Matsumoto on June 9, 2022, during which (1) Plaintiff informed the Court that "the case to EEOC was filed in December 14," within the 180 day deadline, *see* ECF No. 47 at 4:13, (2) Judge Matsumoto may have concluded, based on Plaintiff's representation, that the action was timely with respect to his June 25, 2020 suspension, and (3) Defendant failed to state any objection at that time. *See generally* ECF No. 47. Defendant stated at oral argument before this Court that it did not believe that it had waived this affirmative defense during the pre-motion conference before Judge Matsumoto, and the Court invited supplemental briefing from Defendant on this question, which Defendant submitted on March 3, 2023. ECF No. 46.

The Court agrees with Defendant that its timeliness defense was neither waived nor adjudicated at Judge Matsumoto's earlier telephone conference. Because the entire purpose of the June 9, 2022 conference before which Judge Matsumoto was meant, in part, to address Defendant's anticipated motion to dismiss Plaintiff's action as untimely, which Defendant later filed, it would be a strange result indeed to conclude that Defendant waived this defense at the pre-motion conference barring an explicit statement by Defendant to that effect. Moreover, Judge Matsumoto's comment as to the apparent timeliness of this action was based on Plaintiff's representation that he filed a "complaint" with the EEOC on December 14, 2020, but the record currently before the Court demonstrates that

Plaintiff in fact did not file a "charge" with the EEOC within the 180-day limit, and that his December 14, 2020 filing was only an initial inquiry.  The Court also finds it likely that the telephone format of the conference, in which the parties were apparently frequently speaking over each other, may have led to a miscommunication between the Court and the parties—and in any event, the transcript of the call does not provide the clarity required to find that the untimeliness defense raised in Defendant's letter was definitively waived or ruled upon during the telephone conference.[9]

### C. **ADEA and National Origin Claims**

Even if the Court were to conclude that Plaintiff's action is timely, however, there are independent grounds to grant Defendant's motion for summary judgment. Plaintiff's action must be dismissed on the merits, because on this record, there is no evidence from which a reasonable trier of fact could find that he was suspended from his position at the Port Authority because of age discrimination or national origin discrimination.

On summary judgment, a court analyzes claims alleging age discrimination under the ADEA or national origin discrimination under Title VII under the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1983).  *See, e.g.*, *Friedman v. Swiss Re Am. Holding Corp.*, 643 F. App'x

---

[9] The Court also concludes that it cannot excuse the action's untimeliness under the "continuing violation doctrine," since, although Plaintiff was suspended six times, the last of those suspensions is itself untimely.  *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 107 (2002).

69, 70–71 (2d Cir. 2018) (noting, on review of the district court's grant of summary judgment, that "[i]n both the Title VII and ADEA context, we apply the burden-shifting framework articulated in *McDonnell Douglas*"); *Knutson v. G2 FMV, LLC*, No. 14-CV-1694, 2020 WL 2765771, at *3 (S.D.N.Y. May 28, 2020) (applying the *McDonnell Douglas* framework to a plaintiff's claim of age-related termination); *Girand v. Livetiles Corp.*, No. 17 Civ. 9005, 2020 WL 13815102 (S.D.N.Y. Mar. 31, 2020) (same); *Trane v. Northtop Grumman Corp.*, 94 F. Supp. 3d 367, 377 (E.D.N.Y. 2015) (applying the *McDonnell Douglas* framework to a plaintiff's claim of national origin discrimination under Title VII).

The *McDonnell Douglas* framework proceeds in three steps.  First, a plaintiff must "establish a prima facie case" of discrimination by demonstrating "(1) that she was within the protected . . . group, (2) that she was qualified for the position, (3) that she experienced adverse employment action, and (4) that such action occurred under circumstances giving rise to an inference of discrimination." *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 107 (2d Cir. 2010).  If the plaintiff satisfies this requirement, then "the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for its action." *Id.* at 106 (citation and quotation marks omitted).  If the defendant succeeds, then the burden shifts back to plaintiff to "show that the employer's determination was in fact the result of discrimination." *Id. See also Holcomb v. Iona Coll.*, 521 F.3d 130, 138 (2d Cir. 2008) (applying the same framework in the Title VII context).

However, although courts apply the same burden-shifting framework to both

ADEA and national origin claims, these two claims differ critically with respect to the third step of the *McDonnell Douglas* framework. Whereas a plaintiff asserting a claim of national origin discrimination can prevail on a "mixed motive[]" theory— that is, by proving that national origin was a motivating factor, if not the deciding factor, in his employer's adverse employment decision, *see Holcomb*, 531 F.3d at 141–42—a plaintiff asserting a claim of age discrimination under the ADEA cannot proceed on a mixed-motive theory. *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 175 (2009). Rather, the plaintiff must prove that age was the "but-for" cause of the adverse employment outcome in his case. *Id.* at 177. *See also Gorzynski*, 596 F.3d at 106 ("*Gross* makes clear that a plaintiff bringing a disparate-treatment claim pursuant to the ADEA must prove, by a preponderance of the evidence, that age was the 'but-for' cause of the challenged adverse employment action and not just a contributing or motivating factor." (citation and quotation marks omitted)).

Despite the burden shifting *McDonnell Douglas* framework, "the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993).

### i.   Age Discrimination

Although the burden that a plaintiff must meet on the first step of the *McDonnell Douglas* framework is minimal, *Meiri v. Dacon*, 759 F.2d 989, 996 n.10 (2d Cir. 1985), the Court concludes that Plaintiff has failed to make out a prima facie case of age discrimination. Plaintiff certainly satisfies the first three prongs of

29

the *McDonnell Douglas* prima facie requirement: Plaintiff is over forty years old, *see*

ECF No. 21 at 25; he is qualified for his position in light of (1) his long employment

history in electronic systems with the Port Authority and, earlier, with the New

York City Transit Authority, (2) the qualifications outlined on his resume, and (3)

the Port Authority's own description of the qualifications for the position, *see* ECF

No. 1-3 at 72–76; and his June 2020 suspension without pay is undoubtedly an

"adverse employment action," *cf. McInnis v. Town of Weston*, 458 F. Supp. 2d 7, 13

(D. Conn. 2006) ("[P]laintiff's suspension without pay was an adverse employment

action.").

However, even if the Court considers the parties' entire employment history

and not just those events preceding Plaintiff's June 25, 2020 suspension, c*f.*

*Witkowich v. Gonzales*, 541 F. Supp. 2d 572, 588 (S.D.N.Y. 2008) ("Any claim based

on those events is therefore time-barred, although plaintiff may offer those prior

non-promotions as background evidence in support of his timely claim, which is how

we will consider them."), Plaintiff has not met his burden of demonstrating that his

June 25, 2020 suspension occurred under circumstances giving rise to an inference

of age discrimination.

The Court appreciates that discrimination can be difficult to prove, and that,

for that reason, "[n]o one particular type of proof is required to show" that an

adverse employment action "occurred under circumstances giving rise to an

inference of discrimination." *Moore v. Kingsbrook Jewish Med. Ctr.*, 11-cv-3625,

2013 WL 3968748, at *6 (E.D.N.Y. July 30, 2013).  Courts analyzing employment

30

discrimination claims therefore consider a broad array of evidence and allegations. For example, "[a]n inference of discriminatory intent 'can arise from circumstances including, but not limited to, the employer's criticism of the plaintiff's performance in . . . degrading terms regarding the protected group of which she is a member; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge.'" *Mackenzie v. N.Y.C. Dept. of Educ.*, 2023 WL 2711848, at *9 (S.D.N.Y. Mar. 30, 2023) (quoting *Littlejohn*, 795 F.3d at 312) (cleaned up). In addition, "an inference of discrimination also arises when an employer replaces a terminated or demoted employee with an individual outside the employee's protected class." *Littlejohn*, 795 F.3d at 312. Alternatively, a plaintiff can raise an inference of discrimination "by demonstrating the disparate treatment of similarly situated employees but 'must show [he] was similarly situated in all material respects to the individuals with whom [he] seeks to compare [him]self.'" *Kosack v. Entergy Enters., Inc.*, No. 14-CV-9605, 2019 WL 330870, at *6 (S.D.N.Y. Jan. 25, 2019) (quoting *Mandell v. County of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003)). *See also Miller v. Nat'l Ass'n of Sec. Dealers, Inc.*, 703 F. Supp. 2d 230, 245 (E.D.N.Y. 2010) ("Circumstances contributing to an inference of age-based employment discrimination may include: invidious comments about people in the protected age class; more favorable treatment of younger employees; criticism of an employee's work performance in age-related degrading terms; a sequence of events leading to an employee's termination; or the timing of the termination.").

But here, Plaintiff points the Court to no evidence—and, when properly considered, raises no facts to support any such allegations in his Amended Complaint—that give rise to an inference of discrimination under any of the above standards.  For example, although Plaintiff alleges that one of his supervisors once called another "senior" employee "useless," ECF No. 21 at 27, Plaintiff was not the subject of this allegedly degrading language, and the word "useless" does not connote any discrimination based on age.  *See Mackenzie*, 2023 WL 2711848, at *9 (noting that evidence of discrimination can include "the employer's criticism of the plaintiff's performance in ... degrading terms *regarding the protected group of which she is a member*" (emphasis added)).  Moreover, Plaintiff in his Amended Complaint points to no other instances of supervisors using similar language against senior employees.

Plaintiff further pleads that, from 2015 to 2017, "three senior, experienced coworkers Communication System Specialists (CSS): Timothy McCormmack, Jerome Oats, and Michael Pardo . . . were successfully forced out" by Plaintiff's supervisors.  *See* ECF No. 21 at 27.  However, Plaintiff provides no further information about these employees—who apparently had different titles than Plaintiff did, and whose last departure predated Plaintiff's June 25, 2020 suspension by over two years—and the Court has found none in its review of the record.  Without supporting evidence—or even fully fleshed out allegations about the circumstances of these other employees' departures from the Port Authority other than Plaintiff's assertion that they were "senior" and "forced out"—the Court

32

cannot conclude that these allegations, even as pled, support an inference of discrimination with respect to Plaintiff's June 25, 2020 suspension, beyond Plaintiff's subjective belief that this is so.

Plaintiff alleges that "newer" employees were eligible for overtime immediately when they started in 2018, whereas Plaintiff, when he started working for the Port Authority in 2007, had to wait six months for overtime eligibility. ECF No. 21 at 28. However, although Plaintiff can support a prima facie case of employment discrimination by pointing to evidence of "more favorable treatment of employees not in the protected group," *Littlejohn*, 795 F.3d at 312, Plaintiff's allegations regarding this apparent change in practice ten years after the start of Plaintiff's employment do not even meet this requirement since he fails to plead that these "newer" employees were outside his protected group. *See* 29 U.S. Code § 631(a) (noting the ADEA protects any individual who is "at least 40 years of age"). Plaintiff's position is further undermined by the many exhibits in the record in which Plaintiff repeatedly accused his supervisors of engaging in a "corrupt[]" overtime payment scheme for their own self-benefit, and by Plaintiff's repeated allegations in his complaint that his supervisors offered other employees overtime out of "favoritism" and "loyalty," not to discriminate against Plaintiff based on his age. *See, e.g.*, ECF No. 21 at 28–29.

Ultimately, it is clear that Plaintiff's allegations of unfair treatment by his supervisors are not based on unlawful age discrimination barred by the ADEA. Instead, he has alleged that he was treated unfairly because, he says, he was a

principled employee who refused to go along with what he maintains were the corrupt practices of his supervisors—and has further alleged that "newer" employees (of unspecified age) were treated more favorably because they were more likely to go along with these corrupt overtime-payment schemes than were more experienced, longtime Port Authority employees like Plaintiff.  If true, it is certainly understandable that Plaintiff would be frustrated by—and seek redress for—what he believed to be systemic corruption and unfair distribution of overtime benefits within the Port Authority in violation of union rules.  But even in the light most favorable to Plaintiff, the history he describes and the evidence in the record does not give rise to even an inference that Plaintiff's June 25, 2020 suspension was because of his age.

Finally, although Plaintiff does not mention this fact in his complaint or in his response motion opposing summary judgment, the Court found in its own review of the 1,400 page record that a coworker named Nowicki may have referred to Plaintiff as "old guy" on January 8, 2018.  ECF No. 1-6 at 76.  This alone does not give rise to an inference of discrimination for Plaintiff's June 25, 2020 suspension, where the record is otherwise devoid of such evidence.  Even if true, it was a single comment referencing the Plaintiff's age, made by a fellow employee who was not a decisionmaker or otherwise involved in Plaintiff's June 25, 2020 suspension, and which pre-dated Plaintiff's suspension by over two years. *See Naumovski v. Norris*, 934 F.3d 200, 216 (2d Cir. 2019) (noting that "stray remarks, even if made by a decisionmaker, do not constitute sufficient evidence to make out a case of

employment discrimination" (citation omitted)); *Paul v. Postgraduate Ctr. for Mental Health*, 97 F. Supp. 3d 141, 170 (E.D.N.Y. 2015) (concluding that the speakers' status as plaintiff's co-workers "is relevant in the context of Plaintiff's discrimination claims" because "as Plaintiff's co-workers, [they] never had any decision-making authority").

Plaintiff also brings a claim of retaliation against his employers, although he does not cite any particular protected activity in which he engaged and for which his employers allegedly punished him.[10]  The Court's review of the over 1,400 page record indicates that although Plaintiff frequently complained about his supervisors, he never apparently made any complaints about age discrimination—if such a document does exist in the long record, Plaintiff does not direct the Court's attention to it in his Amended Complaint or his briefs.  *See* ECF No. 21 at 44.  To the extent that Plaintiff did engage in such protected activity near the time of his sixth suspension, the Court concludes that Plaintiff's disciplinary history, including five previous suspensions and repeated warnings from supervisors for his behavior in the years preceding his sixth suspension, undermine any inference that his suspension was causally related to any protected activity in which he engaged. *Williams v. City Univ. of N.Y.*, No. 10-cv-2127, 2011 WL 6934755, at *7 (E.D.N.Y. Dec. 30, 2011) ("[W]here a plaintiff is demonstrably at risk of the adverse action in

---

[10]  Plaintiff refers in his Amended Complaint to an "EEO complaint" that he filed in 2018, *see* ECF No. 21 at 29, which appears to be an email that he sent to a Susan Komorowski at the Port Authority.  *See* ECF No. 1-3 at 102.  Although Plaintiff complains about his supervisors in this email and in an attached letter, Plaintiff did not, in that correspondence, state that he believed he was being subjected to age or national origin discrimination.

advance of the protected activity, he cannot show on the basis of temporal proximity alone that the adverse action resulted from the conduct.").

In sum, Plaintiff's conclusory allegations, unsupported by any evidence in the record, simply do not make out any inference of age discrimination. *Cf. Witkowich*, 541 F. Supp. 2d at 589 ("[A]s for the events plaintiff calls a 'pattern and practice' of discrimination, he has offered absolutely no evidence that any of these events were motivated by bias."). Defendant is therefore entitled to summary judgment on each of Plaintiff's age discrimination claims.

### ii. National Origin Discrimination

Similarly, although the first step of the *McDonnell Douglas* framework requires a minimal showing, the Court concludes that Plaintiff has failed to meet his burden at this stage with respect to his claim of national original discrimination. Even if the Court assumes that Plaintiff has satisfied the first three prongs of the *McDonnell Douglas* prima facie framework—that is, his Polish heritage and Polish accent put him in a protected group; he was qualified for his position as an electronic system specialist; and his June 25, 2020 suspension constitutes an adverse employment action—his suspension does not give rise to an inference of national origin discrimination. *Cf. Sethi v. Narod*, 12 F. Supp. 3d 505, 536 (E.D.N.Y. 2014) (concluding for the same reason that plaintiff failed to make out a prima facie case for national original discrimination under Title VII).

Although Plaintiff was on notice that the Court would treat Defendant's motion to dismiss as a motion for summary judgment—and would therefore

36

consider any and all evidence that the parties provided the Court—Plaintiff's claims
of national origin discrimination are supported only by his own conclusory
statements, and no evidence in the record.  For example, Plaintiff attributes his
failure to receive certain promotions over the years to national origin
discrimination.  *See, e.g.*, ECF No. 21 at 27.  Plaintiff also argues that he believes
that his "accent" made him "a very easy target" for discrimination by his
supervisors.  ECF No. 21 at 26.  However, Plaintiff points the Court to no
evidence—and the Court has found none in the voluminous record to which it has
access—that suggests that any of Plaintiff's employers discriminated against
Plaintiff on the basis of his Polish origin, either generally or at the time of Plaintiff's
June 25, 2020 suspension.  For example, Plaintiff directs the Court neither to
discriminatory remarks that Plaintiff's supervisors or co-workers made to Plaintiff
about his Polish heritage; nor to evidence that employees who are not of a Polish
background were treated more favorably than Plaintiff was; nor evidence that other
employees of Polish heritage were treated poorly by Plaintiff's employer.  *Cf. Sethi*,
12 F. Supp. 3d at 536 (concluding that even a plaintiff who directed the court to
specific examples of what he contended amounted to such evidence had failed to
make out a prima facie claim of national origin discrimination).

The Court appreciates that Plaintiff has had a difficult and distrustful
relationship with his employer, and has no doubt that Plaintiff has brought this
claim out of a good faith that at least some of their conflicts are attributable to
national origin discrimination.  However, a litigant's "mere subjective belief that he

was discriminated against" is insufficient to sustain a claim of national origin discrimination. *Id.* (citation omitted); *see also Karim–Seidou v. Hosp. of St. Raphael*, No. 09–CV–51, 2012 WL 6628886, at *5 (D. Conn. Dec. 19, 2012) ("Plaintiff must point to more than his subjective belief he was discriminated against, and an inference of discrimination cannot be drawn 'from thin air.'" (citation omitted)). The Court therefore concludes that Plaintiff has failed to make out a prima facie case for employment discrimination based on national origin.[11]

## Conclusion

For the reasons outlined herein, Defendant's motion for summary judgment is granted in full, and this action is dismissed.

SO ORDERED.

/s/ Nina R. Morrison
NINA R. MORRISON
United States District Judge

---

[11] Defendants' motion rests on its claim that Plaintiff failed to satisfy step one of the *McDonnell Douglas* framework, and its briefing did not address the remaining steps. However, the Court notes that Defendant's exhibits contain ample, non-discriminatory reasons for Plaintiff's June 25, 2020 suspension— including Plaintiff's long history of allegedly ignoring orders; calling his supervisors liars; insisting that his supervisors were corrupt; and refusing to speak with his supervisors, *see* ECF No. 38-4 at 23, 50—which would support a finding that Defendant has met its burden on the second step of the *McDonnell Douglas* framework. In turn, the Court concludes that Plaintiff has not, at step three, addressed the non-discriminatory reasons for his suspension set forth in those reports or raised an inference that these reasons were pretextual. The Court further notes that Plaintiff has a heightened burden at summary judgment with respect to his ADEA claim, requiring him to show that age was the "but for" cause of his June 25, 2020 suspension. *Gross*, 557 U.S. at 176.

Dated: August 3, 2023
Brooklyn, New York